IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| Antonio Herrera,<br>    Plaintiff,<br><br>v.<br><br>Dr. Ohai, et al.,<br>    Defendants. | )<br>)<br>)<br>)    1:20cv227 (LO/TCB)<br>)<br>)<br>) |

MEMORANDUM OPINION

Antonio Herrera, a Virginia inmate, has sued Dr. Paul Ohai, registered nurse (R.N.) Danielle L. Bland, and nurse practitioner (N.P.) Mary Ellen Tormey, claiming that they provided him with constitutionally deficient medical care while he was confined at Buckingham Correctional Center (BCC). See 42 U.S.C. § 1983. Defendants move for summary judgment. [Dkt. Nos. 30, 46]. Herrera has received the notice required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and he opposes the motions. [Dkt. No. 35]. Because the undisputed evidence demonstrates that defendants are entitled to judgment as a matter of law, the Court will grant defendants' motions for summary judgment.

I. Background

Herrera filed this civil action on February 17, 2020. At the time he was incarcerated at BCC. He was transferred there on August 21, 2019, from Sussex I State Prison, where he had been attacked five weeks earlier, on July 15, 2019, and had seriously injured his hand and arm after sustaining multiple stab wounds. This lawsuit centers on the medical care he received at BCC after he arrived there on August 21, 2019, up until he was transferred to Sussex II State Prison less than a year later, on May 26, 2020. As outlined below, the parties principally dispute the appropriate course of treatment for Herrera's injuries.

*A) Plaintiff's Evidence*

In support of his claims and in opposition of defendants' motions, Herrera has submitted two documents signed under penalty of perjury: (1) a declaration attached to the amended complaint [Dkt. No. 11, (Herrera Decl.)]; and (2) his reply opposing defendants' motions for summary judgment [Dkt. No. 35]. He attests that he was stabbed ten times "all over his body," leaving his left hand "paralyzed" [Dkt. No. 35, Pl. Opp. to Summary J. ¶ 2]. At the time, Herrera avers, his fingers were swollen, purple, and numb; he was experiencing what he described as "unbearable" pain; and he could not bend his fingers or grab things. [Id. ¶ 3].

Herrera further avers that he began submitting sick-call requests shortly after arriving at BCC, beginning on August 24. [Id. ¶ 5]. In the first request, he stated that he was seeking treatment for "nerve issues from a wound in [his] arm and also for open wounds [he has] on [his] body." [Herrera Decl. ¶ 3]. Months later, on November 6, he submitted another sick-call request, requesting an MRI to assess the injury he sustained during the stabbing, which has caused him to experience numbness, weakness, and pain in his hand. [Id. ¶ 4]. Herrera followed up with another request on November 18, reiterating the same. [Id. ¶ 5]. On an unknown date, Dr. Ohai cleaned and closed Herrera's wound. [Pl. Opp. to Summary J. ¶ 8]. Herrera avers that his hand nevertheless remained "paralyzed with extreme pain." [Id.].

Herrera had a telemedicine appointment with a neurologist on November 20, 2019. [Id. ¶ 9]. The neurologist recommended that he receive a nerve conduction on his hand, but, according to Herrera, Dr. Ohai rejected the recommendation, insisting that Herrera's hand "has no remedy." [Herrera Decl. ¶¶ 6, 13]. Herrera further avers that Dr. Ohai made this conclusion without conducting an x-ray, MRI, or any other diagnostic tests. [Herrera Opp. to Summary J.

¶ 11]. When Herrera brought this to Bland's attention, he avers, she told him that "Dr. Ohai's decision was the final decision." [Id. ¶ 30].

Herrera avers that he submitted a regular grievance on December 9, 2019, asserting that he had been denied adequate medical care from Dr. Ohai. [Herrera Decl. ¶ 14]. According to Herrera, the grievance was determined to be unfounded because Dr. Ohai had provided care, but Herrera had failed to comply with the treatment plan, including the doctor's prescription for Cymbalta and order to do rubber-band exercises for his hand. [Id. ¶ 15]. Herrera avers that "Dr. Ohai is lying" about refusing medication and rubber-band exercises. [Id. ¶ 16]. Herrera attests that he only questioned his ability to perform those exercises, given that he cannot bend his fingers. [Id.].

Eventually, Herrera was approved for outside medical treatment. In March 2020 Herrera received an x-ray and MRI and saw two hand specialists at VCU Medical Center. [Pl. Opp. to Summary J. ¶¶ 48–50]. Herrera avers that the tests revealed trauma that could be remedied with surgery. [Id. ¶ 67]. Indeed, surgery was performed on his hand and arm at VCU Medical Center on April 13, 2020, two months after he filed this lawsuit. [Id. ¶ 68]. Herrera attests that the surgery was successful in remedying his hand trauma caused by the stabbing. [Id. ¶ 70].

*B) Defendants' Evidence*

Defendants have submitted pertinent medical records of Herrera's from his time housed in the Virginia Department of Corrections. The medical records reveals that, after the stabbing and before his transfer to BCC, Herrera saw Dr. Dennis J. Rivet, a neurosurgeon at VCU Medical Center, on August 2, 2019, for an appointment to follow-up on spine surgery (a lumbar discectomy) that he'd had six weeks earlier. [Ohai Decl. Ex. 1, at VDOC-291]. During the appointment Herrera reported numbness and weakness in his left hand and in the first three digits

3

on his left hand. [Id.]. Dr. Rivet opined that Herrera "seems to have suffered a median nerve injury" and recommended physical and occupational therapy and to follow up in three months for a left upper extremity EMG and a nerve conduction study. [Id.].

The following week, on August 9, 2019, Herrera saw Dr. Barton P. Smith, a physician at Tri-City Surgical Associates, to follow-up on the stab wounds and pneumothorax (collapsed lung) that Herrera sustained during the stabbing attack at Sussex I State Prison. [Ohai Decl. ¶ 9 & Ex. 1, at VDOC-206]; See https://www.mayoclinic.org/diseases-conditions/pneumothorax/symptoms-causes/syc-20350367 (defining pneumothorax) (last visited Feb. 7, 2022). Dr. Smith observed that all of Herrera's wounds were healed and all of the sutures had been removed, and further recommended a neurology follow-up because of a restriction in Herrera's left arm. [Id.]. Herrera received an electromyography (EMG) and nerve conduction study (NCS)[1] of his left arm later that month, on August 20, 2019, the day before his transfer to BCC. [Ohai Decl. Ex. 1, at VDOC 207]. The tests demonstrated "left median nerve injury." [Id.].

R.N. Bland was the Health Authority at BCC during Herrera's incarceration there. [Bland Decl. ¶ 3]. In that position she was responsible for the administration of the prison's medical department, including the deployment of resources for medical services. [Id. ¶ 4]. She attests that her role did not include supervising physicians and that she was never Herrera's healthcare provider. [Id. ¶¶ 5–6]. Dr. Ohai and N.P. Tormey attest in their declarations that neither became a healthcare provider at BCC until November 2019, three months after Herrera arrived and began seeking medical treatment at the prison. [Ohai Decl. ¶ 2; Tormey Decl. ¶ 2].

---

[1] An EMG and an NCS are related procedures that help detect nerve damage. See https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg (last visited Feb. 7, 2022).

4

Once Dr. Ohai became a physician at BCC, he first saw Herrera on November 14, 2019, after a nurse referred him for an emergent evaluation. [Ohai Decl. ¶ 14 & Ex. 1, at VDOC-115]. Herrera had reported numbness and lost sensation in his left hand. [Id.]. Dr. Ohai performed a left upper arm wound exploration; removed three sutures; cultured pus from the wound; and dressed and bandaged the wound. [Ohai Decl. ¶ 15]. The doctor also prescribed ten days each of Bactrim DS (an antibiotic), Tylenol, and wet-to-dry dressing changes. [Id.]; see https://www.mayoclinic.org/drugs-supplements/sulfamethoxazole-and-trimethoprim-oral-route/side-effects/drg-20071899?p=1 (describing Bactrim) (last visited Feb. 7, 2022). Herrera told the doctor he wanted an MRI; Dr. Ohai responded that "there was no current medical indication for that study to be ordered" and advised Herrera that the left median nerve injury was permanent. [Ohai Decl. ¶ 15].

Herrera attended a telemedicine appointment with Dr. Rivet, the neurosurgeon, on November 20, 2019, as another follow up to his spine surgery. [Ohai Decl. Ex. 1 at VDOC 293–94]. During the appointment Herrera complained about his left arm. [Id. at VDOC-293]. Dr. Rivet noted that Herrera had developed swelling and pain in the thumb, first digit, and middle finger on his left hand and that there was discoloration. [Id.]. Dr. Rivet's notes state that the "EMG nerve conduction study" completed in August "was consistent with median nerve injury." [Id.]. Dr. Rivet recommended a "repeat nerve conduction study EMG and placed referral to hand surgery." [Id. at VDOC-294]. Dr. Rivet also noted that Herrera asked about an MRI, but the doctor [d]id not think this will prove useful but will defer to orthopedics." [Id.].

Herrera saw Dr. Ohai the next day, on November 21, 2019. [Ohai Decl. ¶ 20 & Ex. 1, at VDOC-119]. After reviewing Dr. Rivet's notes, Dr. Ohai told Herrera that his injury was permanent, recommended "self-directed physical therapy utilizing balls and rubber bands for left

5

hand/arm exercises," and offered to prescribe Cymbalta, a neuropathic pain medication. [Ohai Decl. Ex. 1 ¶ 20]. Dr. Ohai avers that Herrera rejected the physical therapy and Cymbalta but accepted naproxen for pain management. [Id.]. Dr. Ohai also suggested that additional orthopedic and neurosurgical appointments at VCU should be cancelled based on his interpretation of the EMG study and Herrera's refusal of neuropathic pain medication. [Id.]. Still, the next day VCU Medical Center scheduled Herrera to have the repeat EMG, per Dr. Rivet's recommendation, on January 23, 2020, and that appointment was not actually cancelled by Dr. Ohai or anyone else at BCC. [Id. ¶ 15 & Ex. 1, at VDOC-297; Tormey Decl. ¶ 15].

Meanwhile, Herrera continued to seek treatment at BCC for his left hand. He saw N.P. Tormey on December 9, 2019, and he reported numbness and pain in his fingers and demanded a repeat EMG, which had already been scheduled. [Tormey Decl. ¶ 14]. She reiterated Dr. Ohai's conclusion that the injury was permanent. [Id.]. Herrera then saw Dr. Ohai on December 31, 2019, complaining about itching and pain (as an eight or nine out of ten) at the stab-wound site on his left upper arm. [Ohai Decl. ¶ 29]. When Dr. Ohai inquired about why his pain medication compliance during the past month had been only 15.6%, Herrera replied that he stopped taking the Naproxen "because [he] fe[lt] like it [was] not working," and he did not want to take the Cymbalta because when he had taken it previously it did not work. [Id.] Dr. Ohai examined Herrera's left upper arm and observed "[w]ell-healed surgical scars with no erythema or drainage" and decreased sensation in the medial nerve area. [Id.]. He diagnosed Herrera with permanent left median nerve injury with left upper arm neuropathic pain with no clinical evidence of persistent infection. [Id]. Dr. Ohai described the diagnosis to Herrera: "[T]he proximal end of the damaged nerve is alive and painful, but the distal end of the severed median nerve is dead and cannot be repaired." [Id.]. Dr. Ohai also observed during his examination that

"the comfort level [Herrera] displayed was not compatible with the left arm Pain Score he reported." [Id.] Dr. Ohai ordered Cymbalta 60 mg (an increased dosage from the previous prescription that reportedly did not work) and extra strength Tylenol 1000 mg, and he renewed the naproxen 250 mg prescription. [Id.]. Herrera told Dr. Ohai that he wanted hand surgery to improve his left hand grip and function. [Id.].

Dr. Ohai discussed Herrera's medical care with Dr. Mark Amonette, the Chief Physician and Medical Director at the Virginia Department of Corrections. [Id. ¶ 30]. Dr. Amonette suggested that Dr. Ohai follow Dr. Rivet's treatment recommendations. [Id.]. Following that discussion, on January 17, 2020, Dr. Ohai referred Herrera for an evaluation for hand surgery at VCU Medical Center and also entered an order for Herrera to have the repeat EMG/NCS study at VCU, which was already scheduled for January 23, 2020. [Id ¶ 31; Tormey Decl. ¶ 15]. After that, Dr. Ohai avers, he was no longer involved in Herrera's medical care. [Ohai Decl. ¶ 31].

On January 23, 2020, Herrera received a repeat EMG study at VCU Medical Center. [Tormey Decl. ¶ 16]. Then, on March 9, Herrera visited the VCU Hand Clinic and was examined by physician assistant Natalie Chrismer, who recommended a doppler study and MRI of the left arm as well as a prescription for gabapentin. [Tormey Decl. ¶ 19 & Ex. 1 at VDOC-209]. An MRI was performed later that month on March 25. [Tormey Decl. ¶ 21 & Ex. 1 at VDOC-303].

> The study found multiple areas of penetrating trauma in the left upper extremity including above the elbow involving the median nerve; T2 hyperintense expansion contiguous with the median nerve at the level of trauma suggestive of sequelae of prior injury with at least partial transection; and edema within the biceps and flexor musculature that may be secondary to a combination of posttraumatic edema and denervation.

[Tormey Decl. ¶ 21]. When Tormey reviewed the MRI the next day, she determined that "it was neither an urgent finding nor requiring follow-up during the COVID-19 crisis" and that Herrera could be scheduled for a follow-up with the VCU Hand Clinic when off-site appointments and

transports resumed. [Id. ¶ 22]. Tormey saw Herrera again on April 7, 2020, and she renewed his prescriptions for Cymbalta and Tylenol. [Id. ¶ 24]. On May 26, 2020, Herrera was transferred to Sussex II State Prison and, thus, was no longer under the defendants' care. [Ohai Decl. ¶ 48].

## II. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Hupp v. Cook, 931 F.3d 307, 317 (4th Cir. 2019) (internal quotation marks and citations omitted). In evaluating a summary judgment motion, the Court views the evidence, and draws all inferences, in the light most favorable to the nonmoving party, here, Herrera. See E.W. by T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018).

## III. Analysis

Herrera brings claims for deliberate indifference to a serious medical need against the three defendants. Claims for constitutionally inadequate medical care in a correctional facility have an objective and a subjective component. Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021). To satisfy the objective component, a plaintiff-inmate must prove that he has a serious medical condition that "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019) (internal quotation marks and citation omitted). To meet the subjective component, the inmate-plaintiff must prove that the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but

8

nevertheless disregarded them." Id. at 357 (4th Cir. 2019) (internal quotation marks, alteration, and citation omitted). Defendants' motions focus on the subjective component.

*A) Official-Capacity Claims*

Defendants first urge that the official- capacity claims are not cognizable in this civil action because they are barred by the Eleventh Amendment immunity. They are correct, but only in part. The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Ultimately, this means that the Eleventh Amendment shields state officials acting in their official capacities from claims seeking monetary relief. See Ballenger v. Owens, 352 F.3d 842, 845 (4th Cir. 2003). This shield cannot be wielded, however, to protect against claims for prospective relief because "official-capacity actions for prospective relief are not treated as actions against the State." See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10 (1989). And Herrera, in fact, does seek prospective injunctive relief against the defendant state actors. In the operative, amended complaint, Herrera seeks an order requiring "emergency medical care to plaintiff." [Dkt. No. 11, Amended Compl., at p. 18].

Nevertheless, the official-capacity claims must be dismissed because they have been mooted by intervening events. Herrera's filings make clear that the emergency care he sought consisted of diagnostic tests and hand surgery. Since filing this lawsuit, he received an MRI and the requested surgery. Thus, because "an event [has] occur[ed] that makes it impossible for the court to grant any effectual relief to the plaintiff" in the form of prospective relief, the Court no longer has jurisdiction to consider the official-capacity claims. See Williams v. Ozmint, 716 F.3d 801, 809 (4th Cir. 2013) (internal quotation marks, alteration, and citation omitted).

9

### B) *Individual-Capacity Claim against Dr. Ohai*

Dr. Ohai argues that the undisputed record demonstrates that, assuming Herrera's medical condition was serious, he did not act with deliberate indifference to it during the three-month period he treated Herrera from November 2019 through January 2020. In particular, Dr. Ohai contends that the undisputed record does not establish the he either delayed or refused treatment for Herrera. In Herrera's view, however, the fact that surgery ultimately fixed the problem that Dr. Ohai characterized as permanent demonstrates that the doctor provided constitutionally deficient medical care.

The undisputed record establishes that Dr. Ohai's treatment decisions did not rise to the level of deliberate indifference. First, to the extent Herrera seeks to bring a claim based on his supposed lack of care between August and November 2019, that claim cannot proceed against Dr. Ohai because he did not begin working at BCC until November 2019.

Second, Dr. Ohai treated Herrera each time he was referred to the physician for further evaluation. Dr. Ohai saw first saw Herrera on November 14. During that appointment Dr. Ohai removed three sutures that apparently had been missed by an outside physician; dressed and bandaged Herrera's wound; and prescribed an antibiotic and pain medication. Although Herrera requested an MRI, Dr. Ohai did not believe it was warranted at the time, which was the same conclusion the outside neurosurgeon, Dr. Rivet, reached just two weeks later. Dr. Ohai saw Herrera again on November 21, reviewed Dr. Rivet's notes from the telemedicine appointment the day before, and ultimately disagreed with his decisions to schedule a repeat EMG or a consultation for hand surgery. Instead, Dr. Ohai recommend physical therapy and additional medication. By mid-January 2020, Dr. Ohai, after consulting with the VDOC's Chief Physician, decided to implement Dr. Rivet's recommendations to schedule a repeat EMG and to refer

10

Herrera for hand surgery. Herrera received the EMG on January 23, 2020, and was seen at the VCU Hand Clinic on March 9, 2020. Although Herrera would have preferred Dr. Ohai to have immediately implemented both of Dr. Rivet's recommendations, a "disagreement between an inmate and a physician over the inmate's proper medical care . . . fall[s] short of showing deliberate indifference." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (internal quotation marks, alteration, and citation omitted). This tenet applies when the plaintiff-inmate disagrees with a prison doctor's decision to modify treatment recommended by an outside specialist. See Benninger v. Patel, Nos. 6:00-2812-13AK & 6:00–3133–13AK, 2001 WL 34684733, at *4 (D.S.C. Apr. 4, 2001), aff'd, 22 F. App'x 219 (4th Cir. 2001). And even if Dr. Ohai was initially incorrect that the injury was permanent and could not be fixed with surgery, a misdiagnosis by a non-specialist "may well represent a deviation from the accepted standard of care," but "standing alone it is insufficient to clear the 'high bar' of a constitutional claim." Jackson, 775 F.3d at 178–79.

Moreover, the Court agrees with the decisions of its sister courts in the District of Maryland, which hold that the "deferral of surgery in favor of conservative treatment alone does not amount to deliberate indifference." Alvarez v. Wexford Health Sources, Inc., No. CV PX-17-00141, 2020 WL 2526573, at *4 (D. Md. May 18, 2020) (citing cases). Here, before referring Herrera for surgery, Dr. Ohai had tried to treat Herrera with physical therapy and different pain medications. Within only two months of making that recommendation, Dr. Ohai decided to implement Dr. Rivet's recommendation that Herrera be considered for hand surgery. This shows that Dr. Ohai was treating and monitoring Herrera's condition during the three months that he was involved in Herrera's care and, thus, was not acting with deliberate indifference. See Stevens v. Jividen, No. 1:18cv140, 2020 WL 4496749, at *14 (N.D. W. Va. July 6, 2020),

R. & R. adopted, No. 1:18cv140, 2020 WL 4495476 (N.D. W. Va. Aug. 4, 2020) (concluding that "[a]n inmate cannot establish a claim of deliberate indifference when the relevant medical records demonstrate that the inmate received continuous and reasonable care for his medical conditions," including being "repeatedly scheduled for medical visits in response to his requests, [being] seen by providers, and [being] provided diagnostic testing").

### C) Individual-Capacity Claim against Tormey

N.P. Tormey argues that she is entitled to summary judgment because the undisputed medical record contradicts Herrera's claim that she is responsible for a delay in his medical care.

The Court agrees. The record establishes that when Herrera complained to Tormey about his arm and hand on December 9, 2019, Herrera had already seen a specialist—neurosurgeon Dr. Rivet—*and* he was already scheduled for a repeat EMG nerve conduction study in January. When Tormey explained that Herrera's injury was permanent, she was only repeating the conclusion of Dr. Ohai. Then, shortly after Herrera's MRI in March 2020, she advised Herrera that he would have a follow-up appointment at the VCU Hand Clinic, *even though* there was a moratorium on transport for non-life-sustaining procedures during what was then the very beginning of the COVID-19 pandemic. All told, there is no evidence in the record that as a nurse practitioner, she was qualified to interpret the MRI results or overrule the findings of Dr. Ohai for patients at BCC, nor that she was responsible for delaying Herrera's ability to receive medical care. The Court therefore will grant her motion for summary judgment.

### D) Individual-Capacity Claim against Bland

Bland argues that the undisputed record demonstrates that, as the Health Authority at BCC, she neither acted as Herrera's medical provider nor supervised physicians. Herrera

protests, urging that "Bland has the authority to ask the doctor to provide adequate medical care because she is the top person of all the medical personnel" at BCC. [Pl. Opp'n to Summ. J. ¶ 78].

Herrera cannot create a dispute of material fact with his own speculative opinion about Bland's job duties as the Health Authority at BCC. See F.D.I.C. v. Cashion, 720 F.3d 169, 176 (4th Cir. 2013) (concluding that lay person's affidavit attesting to meaning of tax form was inadmissible at summary judgment because it was not based on personal knowledge, in violation of Federal Rule of Civil Procedure 56(c)(4)). That leaves Bland's sworn testimony that she does not supervise physicians at BCC; that she has no authority to direct them to provide certain medical care; and that she was not actually involved with the provision of medical care to Herrera except with respect to making sure that resources were available for any physician-ordered treatments.

The admissible, undisputed evidence therefore does not support an Eighth Amendment claim against Bland in her personal or supervisory capacities. First, for a personal-capacity claim she must have been personally involved in the alleged violation of Herrera's constitutional rights. See De'Lonta v. Fulmore, 745 F. Supp. 2d 687, 690–91 (E.D. Va. 2010). The evidence shows that Bland was not involved in providing medical care to Herrera. Second, to hold Bland accountable in a supervisory capacity, the evidence must show that she ignored a subordinate engaging in conduct that posed a pervasive and unreasonable risk of constitutional injury to Herrera. See King v. Rubenstein, 825 F.3d 206, 224 (4th Cir. 2016). But the evidence proves that Bland did not supervise the physicians at BCC. Therefore, Bland is entitled to summary judgment on the deliberate indifference claim against her.

Moreover, "[t]here can be no supervisory liability when there is no underlying violation of the Constitution." Doe v. Rosa, 664 F. App'x 301, 304 (4th Cir. 2016). Because the Court has

concluded that neither Dr. Ohai or N.P. Tormey acted with deliberate indifference to Herrera's serious medical need, even were the Court to assume that Bland was their supervisor, the supervisory liability claim would fail as a matter of law.

### IV. Conclusion

For the reasons outlined above, and through an Order that will issue alongside this Memorandum Opinion, the defendants' motions for summary judgment [Doc. Nos. 30, 46] will be granted.

Entered this 28th day of February 2022.

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge